UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| LESTER WATSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:18-cv-02791-DML-TWP |
| | ) | |
| INDIANA DEPARTMENT OF | ) | |
| CORRECTION, et al. | ) | |
| | ) | |
| Defendants. | ) | |

## Order Granting Defendants' Motions for Summary Judgment

Plaintiff Lester Watson, at relevant times an inmate at Correctional

Industrial Facility (CIF), brings this lawsuit pursuant to 42 U.S.C. § 1983 alleging

(1) that defendant Wexford was deliberately indifferent to Mr. Watson's medical

needs by not ordering diagnostic scans after he suffered a head injury, (2) that

defendant Indiana Department of Correction (IDOC) violated his rights under the

Americans with Disabilities Act (ADA) and the Rehabilitation Act by failing to

install a handrail in the bathroom, and (3) that IDOC and Warden Wendy Knight

were negligent. The defendants seek summary judgment on all claims. For the

following reasons, the defendants' motions for summary judgment, dkts. [88] and

[91], are **granted**.

## I. Summary Judgment Standard

A motion for summary judgment asks the court to find that the movant is

entitled to judgment as a matter of law because there is no genuine dispute as to

any material fact. *See* Fed. R. Civ. P. 56(a). A party must support any asserted

undisputed (or disputed) fact by citing to specific portions of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). In deciding a motion for summary judgment, the only disputed facts that matter are material ones—those that might affect the outcome of the suit under the governing law. *Williams v. Brooks*, 809 F.3d 936, 941-42 (7th Cir. 2016). "A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page*, 906 F.3d 606, 609−10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The court need only consider the cited materials and need not "scour the record" for evidence potentially relevant to the summary judgment motion. *Grant v. Trustees of Indiana University*, 870 F.3d 562, 573−74 (7th Cir. 2017); *see also* Fed. R. Civ. P. 56(c)(3).

## II. Facts

The following facts, unless otherwise noted, are not in dispute. While the facts surrounding Mr. Watson's Eighth Amendment claim against Wexford and his ADA/Rehabilitation Act claim against the State Defendants overlap, the court separates the factual background for clarity's sake.

### a. Facts Related to Eighth Amendment Claims

Mr. Watson is blind in one eye and suffers from gout, which sporadically causes mobility issues. Dkt. 108-7 at 2.

On August 30, 2017, Mr. Watson had a medical visit because of a gout flare-up that had caused his foot to swell, making it hard to walk. Dkt. 93-4 at 3–4. The nurse issued Mr. Watson crutches and ordered him to be on lay-in with his meals delivered. *Id.* Later that day, while using his crutches, Mr. Watson slipped on a wet bathroom floor and hit his head on a sink. Dkt. 90-3 at 2. On September 1, 2017, Mr. Watson saw a nurse because of the fall, complaining of headache and dizziness. *Id.* The nurse provided him Ecotrin (a brand of aspirin) and Excedrin Migraine and directed Mr. Watson to remain on lay-in and to forgo work and recreation for five days. *Id.* at 4.

Mr. Watson had several more medical visits because of his headaches. He was seen by Nurse Melissa Lawrence on September 10, 2017, and by Nurse Tamera Smith on November 28, 2017. Dkt. 90-1 at ¶ 6. At the September 10 visit, Mr. Watson reported that he had had a "headache every minute of every day" since his fall, and that the Tylenol he was provided was not helping. Dkt. 90-4 at 2. Nurse Lawrence provided him additional Ecotrin and advised him to place another medical request if his symptoms did not subside or became more severe. *Id.* at 3. At the November 28 visit, Mr. Watson reported to Nurse Smith that his headaches had improved for some time but had started to become more painful, rating his pain as "10/10." Dkt. 102-2 at 4. He also informed her that he had begun noticing spots in

3

his eyes and that his vision was deteriorating. *Id.* Nurse Smith referred him to the provider for further evaluation. *Id.*

On December 5, 2017, Mr. Watson was seen by Nurse Practitioner Loretta Dawson. Dkt. 90-5. During this visit, Nurse Dawson conducted a basic cognitive exam. Mr. Watson was negative for dizziness, extremity weakness, gait disturbance, memory impairment, numbness, seizures, and tremors, and was also negative for neck and back pain. Dkt. 90-1 at ¶ 8. At that time, Mr. Watson was taking Tylenol, which he said was ineffective, so Nurse Lawson prescribed him Excedrin Migraine. *Id.* She did not submit an Outside Patient Referral (OPR) for Mr. Watson to be seen by an outside specialist or for diagnostic testing. *Id.* On January 7, 2018, Mr. Watson requested and received another prescription for Excedrin. Dkt. 102-3 at 2.

Mr. Watson received new eyeglasses on February 27, 2018. *Id.* at ¶ 9. That day he also had an appointment with a doctor where he complained of his continued headaches; he was again prescribed Excedrin. Dkt. 102-4 at 4, 6. The doctor ordered no testing. *Id.*

Mr. Watson subsequently had a follow-up visit with the on-site optometrist, Dr. Christopher Elpers. Dkt. 90-1 at ¶ 9. Dr. Elpers noted that, aside from dry eyes, Mr. Watson's eye exam was normal. *Id.* He did not request a CT scan or MRI for Mr. Watson. *Id.*

Mr. Watson was transferred from CIF to another IDOC facility[1] on March 9, 2018. *Id.* at ¶ 10. There, he had several more visits with healthcare providers about his headaches. On May 24, 2018, he had an appointment with Nurse Rebecca Davis where he stated he continued to have severe headaches after his fall, the Excedrin was not working, and he drank only coffee all day. Dkt. 102-5 at 2. He was again prescribed Excedrin and Ecotrin and educated on the constant use of coffee. *Id.* at 4. At another visit on June 27, 2018, he was prescribed the same medication. Dkt. 102-6. Because the medication was not helping, he again saw a nurse on September 12, 2018, and requested a CT scan. Dkt. 102-7 at 1. She referred him to see a doctor. *Id.* at 3. He saw Dr. Talbot on September 19, 2018. Dkt. 102-8. Dr. Talbot conducted a neurological exam, which was normal. *Id.* at 8. Mr. Watson wanted stronger medication than Excedrin, and Dr. Talbot prescribed him Mobic, a nonsteroidal anti-inflammatory drug. *Id.* at 6. Dr. Talbot did not order any diagnostic scans. *Id.*

Wexford does not maintain a policy pertaining to diagnostic scans that are unavailable at the facility, such as CT scans or MRIs. *Id.* at 11. Rather, providers use their medical judgment to determine if testing is needed, and, if it is, they submit an OPR to the regional medical director, who either approves the referral or provides an alternative treatment plan. *Id.*

---

[1] Neither party states which facility Mr. Watson was transferred to. But since Wexford provides care for all IDOC facilities, where Mr. Watson was transferred is inconsequential.

### b. Facts Related to Disability Claims

Mr. Watson's partial blindness and gout were conditions he had throughout his incarceration at CIF. Dkt. 108-7 at ¶ 2. Between 2011 and 2017, Mr. Watson saw medical providers at CIF at least seven times for gout flare-ups, receiving crutches to aid his mobility several times. Dkts. 108-1–108-10.[2] When Mr. Watson had a gout flare-up, it would be difficult and painful for him to walk, stand, squat, and sit. Dkt. 108-7 at ¶ 3. He also needed more time to use the shower and bathroom. *Id.*

Despite these two chronic conditions, during his annual physicals on October 7, 2016, and October 11, 2017, Mr. Watson was deemed not to have a disability. Dkt. 93-1 at ¶ 5. If Mr. Watson had reported a disability limiting his mobility, it would have been documented in his medical file under disability code "C." *Id.* at ¶ 6.

As discussed above, Mr. Watson slipped and fell on a wet bathroom floor at CIF on August 30, 2017. Mr. Watson attested that he is unaware of anyone else slipping on the wet bathroom floor that day. Dkt. 108-7 at ¶ 5.

Mr. Watson filed a grievance related to his slip-and-fall on October 4, 2017. *Id* at ¶ 9. That grievance was denied in part because Mr. Watson had already been moved closer to a restroom on the first floor that "meets ADA standards as they are

---

[2] The IDOC objects to Mr. Watson's exhibits of his medical records as irrelevant, stating that the records show only the knowledge possessed by Wexford's employees, not the IDOC. Dkt. 110 at 2. However, the court finds the records probative on whether Mr. Watson's gout flare-ups render him disabled within the ADA and considers them for that purpose.

accessible." Dkt. 93-6. Mr. Watson withdrew the grievance on October 25, 2017. Dkt. 93-7.

There is no record of Mr. Watson requesting any kind of disability accommodation relating to bathroom access before his fall on August 30, 2017. Dkt. 93-1 at ¶ 12. If such a request had been made, Derek McMullen, the Physical Plant Director at CIF, would have had record of it, because he is responsible for processing disability accommodation requests. *Id.* at ¶¶ 1, 3, 12–13. Further, if Mr. Watson had requested an accommodation relating to intermittent, rather than permanent, mobility issues, Mr. McMullen testifies that the prison would have worked with Mr. Watson on a possible accommodation, such as the temporary assignment of a porter to assist him. *Id.* at ¶ 14.

### III. Discussion

#### a. Eighth Amendment *Monell* Claim

Mr. Watson alleges that Wexford was deliberately indifferent to his medical needs by failing to perform neurological diagnostic testing for more than three months after he suffered a head injury. To prevail on an Eighth Amendment deliberate indifference medical claim, a plaintiff must demonstrate two elements: (1) he suffered from an objectively serious medical condition; and (2) the defendant knew about the plaintiff's condition and the substantial risk of harm it posed but

disregarded that risk. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Petties v. Carter,* 836 F.3d 722, 728 (7th Cir. 2016) (*en banc*).

Because Wexford acted under color of state law by contracting to perform a government function—providing medical care to state correctional facilities—it is treated as a government entity for purposes of Section 1983 claims. *See Shields v. Illinois Dep't of Corrections*, 746 F.3d 782, 786 (7th Cir. 2014) (citing *Monell v. Dep't of Social Services*, 436 U.S. 658 (1978)). "*Respondeat superior* liability does not apply to private corporations under § 1983." *Id.*  Rather, to prove a deliberate indifference claim against Wexford, Mr. Watson must establish (1) that he suffered a constitutional deprivation—here a violation of his Eighth Amendment right to adequate healthcare—and (2) that the deprivation was the result of an express policy or custom of Wexford, *id.*, or due to its failure to promulgate a necessary policy, *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 381 (7th Cir. 2017).

First, the court must determine whether Mr. Watson suffered a constitutional injury. For purposes of this motion for summary judgment, Wexford does not dispute that Mr. Watson's recurring headaches constituted an objectively serious medical need; thus, the court focuses only on the subjective component. "[C]onduct is 'deliberately indifferent' when the official has acted in an intentional or criminally reckless manner, *i.e.*, the defendant must have known that the plaintiff was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so." *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (internal citations and quotations

omitted). Mr. Watson began to suffer from severe and chronic headaches after he fell and hit his head on a sink. Mr. Watson's healthcare providers rendered some treatment by providing him medication and, in the days after the incident, ordering a multiday lay-in so that he could rest. Still, a prisoner may show deliberate indifference by establishing that his medical providers have chosen "an 'easier and less efficacious treatment' without exercising professional judgment." *Petties v. Carter*, 836 F.3d 722, 730 (7th Cir. 2016) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 n.10 (1976)). The court finds that there is a question of fact as to whether Mr. Watson's medical providers disregarded an excessive risk to his health. He described the headaches as persisting for every second of the day and ranked them as a 10/10 on a pain scale. There is no indication that Mr. Watson suffered from chronic migraines before his injury. He was provided with medication the day after his fall and in subsequent months, but it took thirteen weeks for one of his providers to conduct a cognitive screening. "A significant delay in effective medical treatment also may support a claim of deliberate indifference, especially where the result is prolonged and unnecessary pain." *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010). Although Mr. Watson "passed" the screening, his pain continued for at least nine more months. At no time did any of his providers submit an OPR for Mr. Watson to receive a diagnostic scan, despite the persistence of Mr. Watson's headaches even with migraine medication.

But Mr. Watson is not suing any of the individual providers who made the treatment decisions, so the court must determine whether his injury was caused by

Wexford's policy. The Seventh Circuit has set forth several ways in which a plaintiff

might prove the causation prong of a *Monell* claim:

> First, [he] might show that the action that is alleged to be
> unconstitutional implements or executes a policy statement, ordinance,
> regulation, or decision officially adopted and promulgated by that
> body's officers. Second, [he] might prove that the constitutional
> deprivation[ ] [was] visited pursuant to governmental custom even
> though such a custom has not received formal approval through the
> body's official decisionmaking channels. Third, the plaintiff might be
> able to show that a government's policy or custom is made ... by those
> whose edicts or acts may fairly be said to represent official policy. As
> we put the point in one case, [a] person who wants to impose liability
> on a municipality for a constitutional tort must show that the tort was
> committed (that is, authorized or directed) at the policymaking level of
> government....  Either the content of an official policy, a decision by a
> final decisionmaker, or evidence of custom will suffice.

*Id.* at 379 (internal citations and quotations omitted).

 "The central question is always whether an official policy, however

expressed…caused the constitutional deprivation." *Glisson*, 849 F.3d at 381; *Pyles v.*

*Fahim,* 771 F.3d 403, 409–10 (7th Cir. 2014) (Plaintiff is "required to show that a

Wexford policy was the direct cause of or moving force behind his constitutional

injury.") (internal quotation omitted).

Here, Mr. Watson alleges that Wexford's *lack* of policy regarding the

treatment of head injuries caused his constitutional injury. The failure to make

policy itself may be actionable conduct. *Glisson*, 849 F.3d at 381–82  (internal

citations omitted) (holding that a prison medical provider could be deliberately

indifferent where it failed to establish protocols for the coordinated care of prisoners

with chronic illnesses). But proving *Monell* liability based on an absence of policy is

difficult, because "a failure to do something could be inadvertent and the connection

10

between inaction and a resulting injury is more tenuous," and, therefore "'rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the action of its employee.'" *J.K.J. and M.J.J. v. Polk Co. and Christensen*, 960 F.3d 367, 378 (7th Cir. 2020) (quoting *Bryan County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S.397, 405 (1997)). Mr. Watson does not challenge Wexford's policy of having medical professionals submit a referral to the regional medical director for off-site diagnostic testing, because none of Mr. Watson's treatment providers submitted an OPR. Rather, Mr. Watson argues that Wexford's failure to promulgate a protocol for the assessment and treatment of head injuries resulting from trauma caused his constitutional injury. *See* dkt. 101 at 14.

Mr. Watson must show that Wexford had "'actual or constructive knowledge that its agents will probably violate constitutional rights'" in the absence of a head injury treatment policy. *Glisson*, 849 F.3d 372 at 381 (quoting *Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004)).

> The key is whether there is a conscious decision not to take action. That can be proven in a number of ways, including but not limited to repeated actions. A single memo or decision showing that the choice not to act is deliberate could also be enough. The critical question under *Monell* remains this: is the action about which the plaintiff is complaining one of the institution itself, or is it merely one undertaken by a subordinate actor?

*Id.*; *see also Thomas v. Cook Co. Sheriff's Dep't*, 604 F.3d 293, 30304 (7th Cir. 2009) (noting jury was presented "evidence of a widespread practice of failing to review inmates' timely filed medical requests" through testimony from a variety of

witnesses, including policymakers, who testified "about a practice that went on for an extended period of time."). Mr. Watson presents no evidence that, when inmates suffer traumatic head injuries, Wexford employees had a widespread practice of forgoing referrals for scans when they were medically indicated or of not conducting cognitive testing immediately after an accident. His only evidence consists of his *own* medical records, which reflect the actions "undertaken by a subordinate actor." *Glisson*, 849 F.3d at 381. And, again, Wexford cannot be found liable via a theory of *respondeat superior*. *Shields*, 746 F.3d at 786. Wexford had a policy in place to allow providers to refer inmates for outside testing when the provider deemed it medically necessary. The fact that none of Wexford's employees submitted an OPR indicates that they *as individuals* may have disregarded an excessive risk to Mr. Watson's health, but not on account of a Wexford policy.

Absent evidence of a pattern of problems caused by a lack of head injury protocol, Mr. Watson could still present a viable *Monell* claim if he showed that the "risk of constitutional violations [was] so high and the need for training so obvious that [Wexford's] failure to act [reflected] deliberate indifference" allowing "an inference of institutional culpability." *J.K.J.*, 960 F.3d 367 at 380. In *J.K.J.*, the Seventh Circuit found that a county's awareness of sexual misconduct between inmates and guards, the captain's participation in "sexually inappropriate banter," and the imbalanced power dynamic inherent in the relationship between female inmates and male guards constituted probative evidence that its existing sexual abuse policy was constitutionally lacking. *Id.* at 383. In *Glisson*, the Seventh Circuit

12

found that the existence of IDOC Guidelines addressing the coordination of medical care that the healthcare provider was aware of but declined to adopt showed that the provider made a "conscious decision" to eschew a coordination of care policy. 849 F.3d at 379 at 380–81.  Mr. Watson presents no such evidence. There is no indication that IDOC maintains a head trauma policy that Wexford ignored. Mr. Watson received a neurological assessment but argues that the thirteen-week delay in the assessment was problematic. But again, there is no evidence that Wexford encourages or directs its employees to delay testing. And there is no evidence that Wexford was aware or should have been aware that its employees delay testing.

Because there is no evidence that Wexford's lack of head injury policy "caused the constitutional deprivation," *Glisson*, 849 F.3d at 379, Wexford's motion for summary judgment is **granted**.

### b. Americans with Disabilities Act and the Rehabilitation Act Claim

Mr. Watson argues that IDOC discriminated against him in violation of the ADA and the Rehabilitation Act because, due to his mobility and vision impairments, Mr. Watson was denied full access and use of the restrooms at CIF.

Both the ADA and Rehabilitation Act prohibit discrimination against an individual with a disability. Relief under these statutes "is coextensive" and "the analysis governing each statute is the same" except that the Rehabilitation Act includes an additional element of receipt of federal funds. *Jaros v. Illinois Dept. of Corrections*, 684 F.3d 667, 671 (7th Cir. 2012).  "In view of the similarities between the relevant provisions of the ADA and the Rehabilitation Act," courts are

instructed to "construe and apply them in a consistent manner." *Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599, 607 (7th Cir. 2004). Thus, the court's analysis applies to both the ADA and the Rehabilitation Act, but the court will refer only to the ADA.

Title II of the ADA provides, in relevant part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The defendants do not dispute that IDOC is a public entity within the meaning of Title II. *See Love v. Westville Corr. Ct'r*, 103 F.3d 558, 559 (7th Cir. 1996) (assuming, because of prison's concession at oral argument, that the ADA applies to prisons). Access to certain housing facilities, including restrooms, is among the programs and activities protected by Title II of the ADA and the Rehabilitation Act. *Jaros*, 684 F.3d at 672.

IDOC first argues that it is entitled to summary judgment because Mr. Watson does not have a disability under the meaning of the ADA or the Rehabilitation Act. In response, Mr. Watson argues that the IDOC ignores the ADA Amendments Act of 2008 (ADAAA). Congress enacted the ADAAA in response to U.S. Supreme Court decisions that had "narrowed the broad scope of protection intended to be afforded by the ADA." 110 P.L. 325, 122 Stat. 3553.

The ADA specifically defines the term "disability" in the statute. It means, "with respect to an individual – (A) a physical or mental impairment that

substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). And despite the fact that Mr. Watson's gout flare-ups are intermittent, under the 2008 amendments to the ADA, an "impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 42 U.S.C. § 12102(4)(D); *see also Gogos v. AMS Mech. Sys.*, 737 F.3d 1170, 1172–73 (7th Cir. 2013) (holding that, under the 2008 amendments to the ADA, the fact that an impairment is episodic, brief, or occurs infrequently "is no longer relevant to determining whether the impairment substantially limits a major life activity"). "Major life activities" includes "walking, standing" and "bending." 42 U.S.C. § 12102(2)(A). Mr. Watson's gout[3] sporadically inhibits his ability to walk, stand, squat, and sit, so he is therefore disabled under the ADA.

Accordingly, the court examines whether IDOC discriminated against Mr. Watson by not installing a handrail in the bathroom. As relevant here, "[t]o prove disability discrimination, a plaintiff must show that '(1) the defendant intentionally acted on the basis of disability, [or] (2) the defendant refused to provide a reasonable modification.'" *CTL v. Ashland Sch. Dist.*, 743 F.3d 524, 528 (7th Cir. 2014) (quoting *Wis. Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 753 (7th Cir. 2006)).

---

[3] Mr. Watson includes no facts as to how his partial blindness played a role in his slip-and-fall incident or access to the bathrooms at CIF generally. His grievance, dkt. 1-1 at 15–16, and affidavit, dkt. 108-7, only mentioned how his gout flare-up contributed to his fall. Accordingly, the court focuses solely on Mr. Watson's gout as a qualifying disability that could potentially require an accommodation.

Mr. Watson seeks money damages in this action. To recover compensatory damages under either the ADA or the Rehabilitation Act, he must show intentional discrimination. *CTL*, 743 F.3d at 528, n. 4. Circuits are split on the applicable standard for showing intentional discrimination, with some using a discriminatory animus standard, while others apply a deliberate indifference standard. *Prakel v. Indiana*, 100 F. Supp. 3d 661, 684 (S.D. Ind. 2015). The Seventh Circuit has not addressed the issue, but to show intentional discrimination this court has previously applied the deliberate indifference standard, noting that "it more closely aligns with the remedial goals of the ADA and Rehabilitation Act." *Id.* (citing *Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 344 (11th Cir. 2012)). To show deliberate indifference, Mr. Watson must establish that IDOC "(1) knew that harm to a federal protected right was substantially likely and; (2) failed to act on that likelihood." *Id.* at 685 (citing *Liese*, 701 F.3d at 344).

With respect to the first element, a public entity is on notice that a disabled person requires an accommodation if the person alerts the entity of his need for accommodation or if the need for accommodation is obvious. *Id.* (citing *Duvall v. County of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001)). Mr. Watson acknowledges that he did not ask IDOC for an accommodation for his disability before his accident but asserts that the need was obvious. He cites to *McKinnie v. Dart*, 2015 WL 5675425, *6 (N.D. Ill. Sept. 24, 2015), in which the plaintiff, who relied on a prosthetic leg, alleged that he made several informal requests to be assigned to an ADA-accessible housing unit. The court concluded that even if the plaintiff never

16

made those requests, the fact that the booking officer in the jail knew about his prosthetic leg "may be enough" to establish the requisite knowledge. *Id.* Mr. Watson argues that "a man who cannot see from one eye and who, at times, cannot walk without the help of a mobility aid is as likely, if not more so, to need assistance as a man with a prosthetic limb." Dkt. 107 at 13. The court finds that argument unpersuasive and *McKinnie* distinguishable. Reliance on a prosthetic leg is a permanent challenge and is readily visible. Mr. Watson periodically suffered from gout flare-ups serious enough that the medical provider issued him crutches as a mobility aid, but Mr. Watson did not request any additional accommodation from his medical providers or IDOC. *See Prakel*, 100 F. Supp. 3d at 685–86 (noting that whether the defendant failed to satisfy its duty to act in response to an accommodation requests should consider the plaintiff's preferred accommodation). And, as IDOC points out, Mr. Watson cannot impute his *medical providers'* knowledge about the intermittent flare-ups onto IDOC. The evidence shows that Mr. Watson first told IDOC of his need for handrails in a grievance after he fell, only to subsequently withdraw the grievance. Therefore, Mr. Watson's need for an accommodation was not obvious.

Further, Mr. Watson offers no basis to conclude that bathroom handrails were a necessary accommodation for his alleged disabilities. Mr. Watson must show that "'but for [his] disability, he would have been able to access the services or benefits desired.'" *King v. Hendricks Co. Comm.*, 954 F.3d 981, 989 (7th Cir. 2020) (quoting *Wis. Cmty. Servs., Inc.*, 465 F.3d at 754). In other words, the question is whether

17

the lack of handrails in a bathroom with wet floors "hurts handicapped people *by reason of their* handicap, rather than … by virtue of what they have in common with other people." *Wis. Cmty. Servs.*, 465 F.3d at 749 (emphasis in original) (internal quotation omitted). Mr. Watson's evidence falls short. He attests that he is unaware of anyone else slipping on the wet floor in the bathroom, but he lacks personal knowledge as to whether any other inmate fell that day. Wet floors are slippery for everyone. Federal courts are consistent in holding that slip-and-fall incidents do not meet the deliberate indifference standard for Eighth Amendment claims. *See e.g. Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996) ("an inch or two" of accumulated water in the shower was not "an excessive risk to inmate health or safety"); *Carroll v. DeTella*, 255 F.3d 470, 472 (7th Cir. 2001) ("[F]ailing to provide a maximally safe environment, one completely free from …safety hazards, is not a constitutional violation."). Because wet floors are a hazard commonly shared amongst all people, Mr. Watson cannot show that his accident was the result of his lack of access to the restroom on account of his disability.

In conclusion, the court finds that Mr. Watson suffers from a disability under the ADA, but no reasonable juror could conclude that he was denied access to the bathroom as a consequence of IDOC's intentional discrimination. IDOC's motion for summary judgment is therefore **granted** on Mr. Watson's claims under the ADA and the Rehabilitation Act.

### c. Indiana Tort Claims

Because the court has dismissed Mr. Watson's deliberate indifference claims, the court must decide whether it should exercise supplemental jurisdiction over his state law claims.

The court has discretion whether to exercise supplemental jurisdiction over a plaintiff's state-law claims. *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009); *see* 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction . . . ."). When deciding whether to exercise supplemental jurisdiction, "'a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity.'" *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)).

The Seventh Circuit has made clear that "the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly*, 193 F.3d 496, 501 (7th Cir. 1999); *see also Sharp Electronics v. Metropolitan Life Ins.*, 578 F.3d 505, 514 (7th Cir. 2009). An exception to the general rule includes "when it is absolutely clear how the pendent claims can be decided." *Davis v. Cook Cnty.*, 534 F.3d 650, 654 (7th Cir. 2008) (internal quotation and citation marks omitted). "If it is absolutely clear that the pendent claims can be decided in only one way, the district judge can and should decide [them], to save the time of the state court." *Bowman v. Franklin*, 980 F.2d

1104, 1109 (7th Cir. 1992) (quoting *Martin-Trigona v. Champion Federal Sav. &
Loan Ass'n*, 892 F.2d 575, 578 (7th Cir. 1989)).  As explained below, because it is
absolutely clear how the pendent state law claims can be decided, the court will rule
on the merits of Mr. Watson's state negligence claim.

Mr. Watson's negligence claim against the IDOC and Warden Knight fails
because Mr. Watson never submitted a notice of tort claim, as required by the
Indiana Tort Claims Act ("ITCA"). *See* dkt. 93-8 (Affidavit of Matthew Broadwell,
Deputy Director for Investigations of the Office of the Indiana Attorney General,
attesting that there was no evidence that Mr. Watson ever filed a notice of tort
claim). The ITCA requires "a two-step process—the filing of a claim and, if denied,
the filing of a lawsuit," and courts are to bar lawsuits unless "the person's claim has
been denied in whole or part." *Brown v. Alexander*, 876 N.E.2d 376, 385 n. 4 (Ind.
Ct. App. 2007) (citing I.C. § 34-13-3-13).  Mr. Watson's response does not dispute
that he failed to file a notice of tort claim.  Thus, the defendants' motion for
summary judgment on the negligence claims is **granted**.

## IV. Conclusion

For the reasons explained above, the defendants' motions for summary
judgment, dkt. [88] and dkt. [91], are **granted**. Mr. Watson's claims are **dismissed
with prejudice**. The pretrial conference scheduled for November 9, 2020, and the
jury trial scheduled for December 8, 2020, are **vacated**. Final judgment shall issue
accordingly.

**So ORDERED.**

Date: 9/30/2020

*Debra McVicker Lynch*
Debra McVicker Lynch
United States Magistrate Judge
Southern District of Indiana

Distribution:

LESTER WATSON
2913 S. Draper St.
Indianapolis, IN 46204

All Electronically Registered Counsel